Good morning, may it please the court. I'm James Laughlin and I'm here on behalf of the appellant Matt Mackin. With me is Timothy Scott, who's representing the co-defendant Anthony Millan. And as we indicated in the letter we filed a few weeks ago, our plan is to preserve six minutes for him to discuss the evidentiary and restitution issues, three minutes for rebuttal, and I'll spend the first six minutes talking about the constructive amendment and fatal variance issue. The appellant's engaged in a scheme to defraud by using 20% of investors' money to pay telemarketers and using the remainder to fund their own lavish lifestyles. That was the crime that was alleged in the indictment. Given its allegations, that indictment can't fairly be read as charging a scheme to defraud that did not depend on the appellant's company being a sham. But the trial evidence established that the company was actually a real legitimate business with ongoing business activities, highly qualified employees, and true business goals. The government therefore presented a different fraud theory, a closing argument, to the jury, and that theory was that the appellants used the investors' money for different business purposes than they had originally intended by financing the completion of independent movies but purportedly not doing so using a particular type of bridge loan. Under this fraud theory, the company wasn't, as the indictment alleged, a complete sham that was designed only to fleece the investors out of their money. So what did the evidence show as to how much of the investors' money was used to invest in companies rather than to either pay the commission of the telemarketers or to fund the, quote, lavish, unquote, lifestyle of the defendants? Well, and Mr. Scott will talk about the steep flaws with the government's financial analysts, but their analysts broke it down. They attributed a little under 40 percent of the total money as being used for so-called personal expenses of the appellant, which of course is a far cry from the 80 percent that the indictment alleged was used for personal expenses because, again, the indictment alleged that 20 percent was used for commissions and the remainder, i.e. 80 percent, was used for personal expenses. So what do we make of the word virtually in the indictment? Yes, there are points where the indictment says that virtually no money was spent on the movie Beyond the Mat and virtually no money was spent on bridge loans. Now, I think that virtually means what it plainly means, almost none. The trial evidence, however, showed that at least with the two main movies that were the focus of the trial, Beyond the Mat and The Devil Inside, $363,000, even under the government's flawed accounting, at least $363,000, that's 10 percent of the invested money, was spent on these movies. I don't see any plain language interpretation of that. But you get to 40 percent because you just said only 40 percent was spent on Lavish Lifestyle, 20 percent for commission, 40 percent on Lavish Lifestyle, that leaves 40 percent, and you just said only 10 percent was spent on the film. Right. So what happened to the other 30 percent according to the government's evidence? Right, for business expenses. And the government had, throughout the trial, tried to create this impression that we're calling this stuff movie money and that's all that matters for movie money, ignoring the fact that this is a business. You have overhead expenses. You're hiring very talented people. You're putting in an editing base so you can edit a movie. You are spending money on promotional materials. So that's where the other 30 percent that's related to the business activities. So the 30 percent is, as it were, overhead of the business. Yes. 30 percent is overhead. No, no, not all. I mean, I guess it depends on how you define overhead. I mean, overhead I typically think of as the basics of rent, utilities, stuff like that, and that's certainly a component of that. But there's also. Employee salaries and so on. Employee salaries. And keep in mind, as we laid out in the brief, they're hiring really high-quality people who worked at Paramount, MGM, who worked on Oscar-nominated movies. They are hiring talented people to make this business work. Clearly. So the government's evidence is then showing that about 10 percent of the investor's money is actually going to these loans. The rest of the money is spent on other things. 20 percent on commission, 40 percent on money to the defendants, and 30 percent to employees, overhead, and so on. That's the evidence. That's if you believe their law expert's testimony correct. But what's important for purposes of the constructive amendment argument is that even if that 40 percent number of conversion to personal use is valid, that's different than what was alleged, which was this was the sole purpose of engaging the scheme. And we've seen schemes like this before. The sole purpose is to put telemarketers in a room to make completely false promises for a business that doesn't exist, to take the money entirely and convert it to personal use. And that's not what the evidence showed. So then that's when the government started moving in this direction of focusing more on, like, the details of, oh, well, money was loaned to be on the mat, but it wasn't a bridge fund loan. And then it was pointed out that even the indictment alleges that bridge fund loans can be loans for finishing or completing movies. And the government says – If the indictment had properly described the evidence presented by the government, would that have amounted to a crime? I'm sorry, could you – you mean just the financial breakdown? That is to say, if the indictment had said they do this telemarketing, saying you're going to make a heck of a lot of money, what is it, 10 to 12 percent, and we're going to invest some of it in films, maybe 10 percent of your money, and 30 percent is going to go to salaries and overhead, 40 percent is going to come to us, 20 percent is going to – so that's the underlying reality, and they're promising, hey, we're going to make these – would that have been a crime? No, I think we'd come down to exactly how it was alleged. But I think that the point that was always made in this case is that the investors were investing in the company. Even though the government tried to say that these promissory notes were somehow going to guarantee that their money would be used in a very narrow way, they were investing in the company, and the company shifted positions – shifted direction due to market resource over time. Maybe my question isn't clear. I mean, the charge here is fraud. Correct. So the description to the investors doesn't match what's actually being done, even according to the evidence. Is the description of what's being done under the governance evidence such a mismatch from the description to the investors that that's fraud? I think it is. Well, I will say with a caveat. The first caveat is – and Mr. Scott will deal with this – is we don't believe those numbers. Those numbers are wrong. I understand that. But if the numbers are correct, then I don't think it's necessarily fraud because the – And I think the jury's verdicts reflected this, that this is a business that went over three or four years, and the focus of the company changed over time. So I think I will agree with Your Honor. If there was a certain point where the government proved that the appellants were making a representation to an investigator that we do X, when at that time they knew they didn't do X and they got the money, then yes, that would be fraud. I don't think – our position has been that they never did that throughout the entire process of the scheme. Got it. Okay. And I see that I'm kind of running into Mr. Scott's time. Unless the Court has any other questions, I'll submit and let him take them. Thank you, Jeff. Thank you. Good morning, Your Honors. May it please the Court, I'm Tim Scott for the appellant, Anthony Wallon. What I wanted to discuss this morning was the opinion testimony that the government was permitted to offer through what it described as a fraud examiner, as well as the summary exhibits that it was permitted to enter into evidence and actually send back to the jury room. The first question in the government's first defense of this kind of evidence was to claim that it was lay opinion testimony, financial opinion testimony, I suppose, under Federal Rule of Evidence 701. There's two problems with that under 701. The first is that under 701A, lay opinion testimony has to be rationally based on the perception of the witness. This Court's case law is clear that rationally based on the perception of the witness cannot include relying on out-of-court hearsay. This Court said that in Lloyd as well as the Reyes-Vera case. Well, let's assume you're right, that it was wrong for it to be introduced this way. The next question we have is that prejudice. You don't have a lot of time. Can you spend some time explaining why it would have made a difference had they gone through and done a Daubert hearing and all that? At the end of the day, what's the difference? Well, I guess, so there's two parts to that. The question is, could she, I guess one way to put that question is, could she have qualified as an expert anyway? And then the other is, what was the harm of what actually happened in trial? So I'll try to address both quickly. In terms of the Daubert, I guess I would concede that at some level she would be able to qualify herself or be qualified as a forensic accountant. She's a CPA. She has that training and so on and so forth, and that's fair as far as it goes. But whether she could have withstood the rigors of Daubert for these particular opinions I think is a different matter entirely. And the reason for that is that she used what we would describe as unorthodox methodologies. For example, at 1470, cross-examination revealed that she employed kind of a presumption of guilt methodology. For example, if there were purchases made at Costco where it could have been computer screens, it could have been muffins, or it could have been a big screen TV, if she couldn't tell which way it broke, she would categorize it as, quote, unquote, for the benefit of the defendants. So if in doubt, she would characterize it as personal use and sort of describe that to the jury as tantamount to theft from the investors. And so that, and she was asked specifically, is there some sort of protocol or some sort of recognized procedure in the field of accounting where you can do that? Are your categories based on any standardized procedures or things that are recognized in the field of accounting? The answer to all those were no. This was essentially categories of her own creation that was prepared for trial. So that's a long way of saying, in a short way, I don't think that her opinions themselves would have withstood Daubert. Now, what's the actual harm of the way it unfolded in trial? And there's a couple answers to that. The first is that this really did go to the heart both of the government's case that they indicted as well as the defense. The defense was good faith. As my colleague argued, this was a legitimate business. They were trying to do right by investors. They were trying to make money for everyone. Now, if one accepts as true the opinion, the financial opinion, that the defendants essentially used almost $1.5 million out of $3 million and change for their own purposes, that does great violence to that good faith defense. And we would argue unfairly because of this questionable methodology and relying on the out-of-court hearsay. I think it's also worth bearing in mind that this wasn't just an ordinary witness. This was somebody who was closely aligned with the United States Attorney's Office. We didn't present this as a vouching case, but it raises some of the similar concerns that she is imbued with the inherent credibility and the gravitas of the United States Attorney's Office. She was an employee of that office for 20-some years, and she was also presented with the trappings not just of the government but of expertise. The government went through her training, experience, and continued education, and then these things were presented as if they were objective numbers when, in fact, they were financial opinions. In terms of harmlessness, again, this was a close case. The government started with a 19-count indictment. They were able eventually to get 11 of those counts even to the jury, and then of those 11 counts, the jury acquitted on 8 and only convicted on 3. So I think it respectfully strains the government's credibility for them to say that guilt was overwhelming. I think the jury result and the jury verdict say otherwise. Well, you know, it does seem to me, however, that if this case had been indicted, basically in alignment with what was proven at trial, that we've got a fraud here. I mean, they're promising Bernie Madoff returns or excessive Bernie Madoff returns, 12% to 13%, and they're investing a very small percentage of the money in something that could possibly have made money. That's just fraud. Well, and I don't want to— Maybe we've got a problem with variance. It may be a problem we have with evidence. But if it is as I have just described, that's fraud. If it is, and if it was charged that way. So I guess the way that I would respond to that is to say, you know, those are very good arguments to make, and if the government had indicted that case and then proven that case, well, that would be a different matter entirely. But for them to indict one version of the case, and then as the evidence unfolds sort of pivot into the argument that Your Honor just made, well, that's what the variance is. And I guess what I would conclude with is to say that even— let's say for the sake of argument that this is, you know, a close case as to variance. Maybe it's a constructive amendment. Maybe it's a fatal variance. Even if it falls short of that, and I'm not saying it does. I think it should. But even if it falls somewhat short of that, I think the fact that the government scrambled a bit or altered their approach a little bit and pivoted into this alternative argument, whether that amounts to reversible error or not, if nothing else, suggests that this wasn't an overwhelming case for the government, that this was harmless error, and that these opinions and the financial testimony that was set forth did do harm. All right. Well, you've used all the time, but we'll give you three minutes for final arguments. Thank you so much, Your Honor. All right. May it please the Court. Veronica Dragan on behalf of the United States. And I'll begin addressing the constructive amendment argument unless the Court has other questions. Judge Fletcher, I think, zooms into the issue here, which is that the indictment charged a fraud, which boils down to the fact that these defendants marketed a business that was engaged in providing short-term bridge loans and funding to this movie Beyond the Mat. They were telling investors that the C-22 was able to get 30% returns on a 90-day turnaround, which made it a very profitable company. It allowed them to then give those 12% returns to investors. With seven investors testified at trial, they each gave consistent testimony that that's what the defendants, either directly or through their sales force, represented to them. That's what mattered to them. They relied on those promissory notes, on those statements. And the best evidence of that, the clearest, is the marketing materials themselves. The brochures have various statements about how the business is already engaged in short-term bridge loans, that they make 30% on their investment, that it's a 90-day turnaround. Those are all false statements. They are. They plainly are. And when you are making false statements for the purpose of luring in investors, and they depend on those statements, if you don't do what you promised, that is fraud. So why did you write the indictment the way you wrote it? I mean, you're just asking for trouble. Respectfully, Your Honor, the evidence at trial was entirely consistent with the indictment. The defendants do zero in on one sentence that's part of this indictment. But the way that the scheme is described is exactly what the evidence proved, that the defendants represented that victims' money would be used to provide short-term bridge loans to individuals and companies in the entertainment industry for the purpose of finishing and or promoting movies and to fund a movie titled Beyond the Mat. The evidence at trial that the defendant, Machen, agreed with is that this company made $0 in the form of interest from loans. Any types of loans. Short-term bridge loans, finishing funds. They made $0 from making loans to movies and getting back interest. Yet over the course of four years, they continue to represent that this is what their business did. And that is fraud. And calling it a complete sham versus a legitimate business, that is not an important distinction. A, quote, legitimate business would not make this any less fraud. For example, if their business was actually engaged in a successful car sales business, if you're representing to investors that you're getting these 30% returns, but then you turn around and you're buying and selling cars, you lied to investors to get their money. And that is fraud. So here, the fact that they spent some portion of it on commissions, some portion on it on restaurants and spas, they didn't do what they promised to investors. That's what the indictment alleges in Paragraph 4 of the indictment. There are specific false representations set out, and those were the exact false representations that were proven at trial through the investor testimony, the brochures that were sent out, the promissory notes that were sent out, the employees that testified about how the defendants made false representations to investors, how they actually spent the money going to restaurants and strip clubs, and for one of the defendant's wife's liposuction, that was the testimony at trial. And so the fact that the exact percentage of how much of it was. Now, when you present that they're using it for the lavish lifestyle, you're saying that the salaries that they drew were spent on these things, right? The sentence is phrased as, and this is Paragraph 3C of the indictment that the defense attorney read, is that defendants Machen and Millen used the remainder of the victim's money to find their own lavish lifestyle, including paying themselves salaries of $10,000 to $12,000 per month and using victim's funds to pay their personal bills. Right. Now, $10,000, $12,000 a month sounds like a lot of money, but for someone who's a serious investor or financial person, that's pocket change. That may be so, Your Honor, but again. That's even less money than a federal judge makes. For some of us, that may seem like a lavish lifestyle nonetheless, and the evidence that, for example, Ms. Chekay, the fraud examiner, presented is that over $43,000 were spent on restaurants over the course of the four years of the company. Over $4,000 were spent on spas. I do believe that that evidence is consistent with what is alleged in the indictment, and that is that these defendants, first and foremost, did not spend the money as they promised, which is what really matters. My problem, and I'm not sure whether it amounts to a fatal variance or amendment, is this is clearly just not what's shown. I'm now reading from the indictment. Virtually none of the money provided was used to provide bridge loans. Well, that's the definition we're going to fuss over virtually. About 10% was, as I gather. That's your evidence. Your Honor, I disagree with that because what it says here is that virtually none of the money was used for bridge loans. The evidence at trial showed that these defendants, this company, provided no bridge loans. The producer of Beyond the Mat testified that even though there was some money invested into Beyond the Mat, it was not in the form of bridge loans. Okay, I get it. Okay, then you say, the indictment rather says, defendants provided telemarketers with commissions of approximately 10%. Defendants used the remainder to fund their own lavish lifestyles. Now, that doesn't sound as though that's right. That is to say, this sounds as though they spent 80% on themselves. It doesn't sound like that's true. And, Your Honor, this may be sufficient of the evidence argument in that the government alleged one thing in the indictment, and arguably at trial they were not successful in proving this sentence of the indictment. However, for purposes of what crime was alleged here, the way that the scheme to defraud was defined, which is making these specific false representations, which are the false representations proven at trial, that was established, and showing that the defendants did indeed have an intent to defraud. They knew that these representations were false, yet they continued making them, and investors continued to rely on them to put in $3.3 million. And over the course of this company, this company did not earn any profits. Their only money coming in was investor money. Yet they continued telling them year after year that they had this ongoing business of bridge loans, which was just false. There's nothing in the record to suggest that there was any profit from bridge loans or any type of loans to movies, and that is fraud at the end of the day. The investors ever given any money back? There was a small percentage of investors who did receive interest back. However, as the evidence at trial showed, that was really taking investor money from some investors and giving it to others. At some point, a law firm instructed the defendants that that was illegal, so they stopped doing that. So only a very small percentage of investors got some money back. The large majority lost all of their investment. And on this point about that one sentence, zeroing in on just one sentence of the indictment, this point was not emphasized in the government's brief, but this court in Ward, for example, stated that, We have declined to find a constructive amendment, however, when the indictment simply contains superfluously specific language describing alleged conduct irrelevant to the defendant's culpability under the applicable statute. And I believe that's what this falls under, is that there is a specific sentence in the indictment about how this money was spent. That is not an element of the crime here. Perhaps the government did not meet the burden of proving beyond a reasonable doubt that that's how the funds were misspent, but what was clearly proven is that these representations were false. The investors relied on them. They had the intent to defraud. I'll then move on to the summary evidence and opinion testimony. And the case that I believe is fully on point on both of those issues here is Aubrey from the circuit, a 2015 case. In that particular case, this court, the defense challenged the introduction of a forensic auditor, who introduced a series of charts reflecting the movement of funds among business and personal accounts. And the court there found that the particular witness was not required to be certified as an expert because the witness testified about his own personal investigation in his capacity as an auditor in accordance with Federal Rule of Evidence 701. Although the witness in that case might have been eligible to be certified as an expert, the district court properly restricted his testimony to the areas on which he had personal knowledge. The documents, investigation, and the methods he used to prepare his summary. So, counsel, that's where I'm having trouble with what happened here. Yes, if something testifies about how many checks were written to Louis Vuitton and they put that on a chart, or how many checks were written towards mortgage, absolutely. I call those types of witnesses myself. But here, the witness did not have personal knowledge about some of these things. The witness said, oh, I read a 302 where this other person said this, so based on that, which is not personal knowledge. Do you have any authority that supports what happened in this case, where the witness did not have personal knowledge, was relying on other people to then take that testimony or that information and then categorize? So here, I think it's important to break down what exactly the witness did here. What she explained is she looked at the bank records, three bankers' boxes full of bank records. She became familiar with the bank statements of this company. And she categorized things into various categories based only on that information she had in front of her, the notations on the checks. For example, if it was a debit card transaction that Mr. Millen was using, she would call that a payment to Mr. Millen. Or if a check was made out to John Smith and John Smith was an employee, that was considered an employee payment. So yes, there were certain facts that she learned throughout the investigation that were important to her categorization. And the defendants call that hearsay because it was written down in a 302 report. But really what they are are facts. Well, hold on. Facts are what's admissible in evidence. So we have to be careful, especially these days using the word facts, right? But here we have a situation where she had no personal knowledge outside of – she was not a witness to this fraud and yet she was – I didn't think my point was that good, but I appreciate it. I'm rather enjoying it. It's okay. All right. So I guess my question is that it's a little unusual in my experience to have someone not designated as an expert to then rely on out-of-court information and then testify – use that out-of-court information and then testify at trial about numbers and documents. But here it's important, I think, to recognize how limited this out-of-court information is. Well, no, I agree. Look, it may be at the end of the day it doesn't make a difference in the case. I guess what I'm asking, though, do you have any authority – even though maybe it was limited and small. Do you have any authority saying even if it's small or limited, that's okay under 701? I think the cases that the government cites when it's briefed, there are several out-of-circuit cases where courts have addressed this issue about forensic auditors. As we can all imagine, these are common witnesses that are used very often. And so, for example, the First Circuit in Soto Beniquez held that a forensic examiner does not testify as experts because they testify, quote, only about their perception of an event or about lay opinions arising out of those perceptions, regardless of any specialized training or experience they may possess. And, again, this is – the rationally based requirement of 701 is satisfied in these types of cases with forensic auditors because they get their direct – they have an understanding about the company that's different from the jury in that they spend so much time with the records themselves. So, no, they were not themselves involved personally, and they didn't necessarily know all the names of the employees, but they have become – they are able to form an opinion that is rationally based on their very tedious review of voluminous records. No, I appreciate that, and I think I've had four trials on my own where we called someone a forensic auditor. I guess my question, though, is that I've never had one where the auditor says, I'm making this conclusion based on what I read in a 302. It's one thing to say, I read all the checks. Here are the number of checks that went to Vons. Here are the number of checks that went to Circuit City. Here are the number of checks that went here. No issues there. What's different in this case – and please direct me to any case anywhere that says it's okay for that same person to then rely on what a 302 says or what an agent tells them to do and to come in and base their testimony based on what – an out-of-court statement and still be treated as lay testimony. I do think the distinction is an out-of-court statement versus just a fact. So, for example, Costco is a store, and this witness knows that. If a 302 said Costco is a store, that doesn't make – Well, I don't think that's what they're complaining about here. But even something like John Smith is an employee, that's just a simple fact. John Smith is an employee. She shortcutted learning that by relying on other people in the investigation who provided her that information. But it sounds like you don't have a case, though. Other than the cases that have held that this type of forensic auditor testimony gets to come in, other than those types of cases, I don't have a specific case that would address that exact issue. But I do think the Aubrey case is very similar where that testimony came in and the summary charts that go with it came in even though it relied in part on, quote, the investigation. Now, if her testimony can't come in – I understand you argue that it can – but if her testimony can't come in, do her charts, the ones that she has prepared and that she is presenting in connection with the testimony, are they also excluded? I think the charts are admissible because they are summarizing bank records. But they've got various things that she's done based on her own judgment. In that case, they are – I do believe they are very interrelated. So if her testimony doesn't come in, the charts may be a problem. But as we pointed out, there are seven separate reasons why this was a harmless error, including the jury instruction, the fact that this evidence – No, no, no, but I want to focus on this question as to if her testimony can't come in because she really should have been qualified as an expert given the nature of her testimony. She's got charts that accompany her testimony that she's prepared, to some degree using her judgment as to, well, this expenditure looks as though it's for personal stuff. Do those charts also have to stay out – come out because her testimony has to come out? I don't think so, not necessarily, because I think her – in some part her testimony just explains the procedure used for those summary charts. The jury then had the underlying records. They could decide what weight to give to those charts. But her testimony as to how they prepare them is based in part upon, what seems to me, her acclaimed expertise, not just on, you know, this chart. These three checks, which are Louis Vuitton, I can see it. It says Louis Vuitton. I've organized that. No, she's saying more than that. She's saying this money spent at Costco or this money spent at so-and-so was for personal expenses. And I see I've run out of time. No, that's okay. I do not – I believe that her testimony here had – there is no expertise required for what she did, which is to just read a notation on a check and then debit and credit. But that goes back to your argument thinking that her testimony should come in. That's correct. And I'm saying, well, let's assume it can't. And the reasons it can't come in is it's expert testimony because there's some amount of judgment that goes there. And some of the chart is – or the charts are dependent upon her exercise of judgment. That is correct. But, Your Honor, 701 allows for lay opinion, and an opinion does call for judgment. That's what it is. Well, that's back to whether her testimony can come in. Correct. As you believe, they are tied together. Except for her charts and her testimony, the government's testimony is basically that on a few occasions from other witnesses there was a personal use. But it leaves the vast majority of the expenditures unexplained without her testimony or charts. The key issue is whether the money was used on bridge loans and the undeniable fact at trial is that none of them were used on bridge loans. And there was independent testimony from Lorna Paul and from Brian Coyne about how much money was actually given to Beyond the Mat and The Devil Inside. And that by itself establishes the government's fraud theory that a very, very small percentage of all investor funds were actually used as promised on the money. So even without these charts, even without the summary testimony, the government proves to be the best. That's where I was heading with this. So you take out her testimony, you take out her charts.  Absolutely, Your Honor. It was argued that way in the closing argument by the government. What's the testimony that nothing was used on bridge loans? The defendant's own testimony, Your Honor. I have quotes here where he's asked, Question, you didn't have any money coming in from bridge loans, right? Answer, yes, that's correct. That's on page 1782. Question, there was never any money coming to C-22 Capital from its funding of bridge loans, right? Answer, that's correct. The industry changed. The defendant himself admitted that there was no money coming in from bridge loans during this entire course of four years of the business. And where do we get the testimony as to what money was being paid to the defendants in terms of their salaries? Where's that evidence coming from? The defendant himself on direct examination, Defendant Maschen on direct examination admitted that he was paid $10 million in salary during the... $10 million? $10,000, I apologize, during 2009. And in addition, there were... Is there anything wrong with that? Excuse me? Is there anything wrong with that? When you promise investors that their money is actually going to go into this bridge loan model, but instead you're using it to pay yourself salaries, to pay commissions, not like you promised, you are deceiving investors in terms of what's going to happen with their money and what their expectations are for returns. And so was there evidence at trial, independent of the evidence that comes in from this forensic examiner, as to the 10% goes off to these loans that are not bridge loans, but the other 90% is spent on commissions, on salaries to themselves, and expenses? I mean, that evidence is coming in any event? We know that before? Yes, Your Honor. Brian Coyne testified that the defendants paid themselves $10,000 per month, and Charles Rice, Lorna Paul, these are several employee witnesses who testified about the inappropriate spending of the money. For example, Charles Rice talking about how Defendant Millen took him out to lunches, dinners, and strip clubs and claimed them as business expensive. Pamela Blastos testified that Machen told her that he spent investor money on his wife's liposuction, and she confronted the defendants about their improper spending. So various other witnesses at trial established that these defendants were using the money inappropriately. Okay. Thank you. Good morning again, Your Honors. Counsel, do you agree that the testimony of the defendants is that none of the money was spent on bridge loans? No. In fact, there was testimony that the money put into Beyond the Mat was a form of bridge loans. I don't think the defendants said that specifically, but there was an expert from the industry who came in and testified that those could be characterized as bridge loans. I would also clarify that when the defendant said that he was drawing a $10,000 salary, he explicitly said that was for a period of several months, and then he stopped and then essentially dropped that down to a subsistence-level salary going forward. So it's not true to suggest that they were taking even $10,000 salaries for any extended period of time. The truth was that the evidence that was admitted at trial showed that they lived very modest, not lavish lifestyles, very modest vehicles. Was there a dispute about the liposuction? I don't think there was a dispute that Mr. Macken's wife got liposuction, but I think that sort of begs the question of did he take a modest salary and then spend what he felt he had earned his salary that way, as opposed to characterizing liposuction as a business expense. I'm sorry, the liposuction was charged to the business or it was paid as a check from the defendant? I believe it was a check from the defendant, but I couldn't swear to it as I stand here. I don't know is the short answer. So what I was going to say is that the answer to His Honor's question, is there a case that says that you can rely on hearsay and out-of-court statements either in a 701 opinion testimony or in a 1006 chart, the answer is no. There is no authority that says that you can do that. The only authority, and we cited the Polubo case, which I think is pretty close to all fours from the Third Circuit. There's a Sixth Circuit case, the ones we cited in our briefs, all of the leading treatises that just quite clearly you can't rely on hearsay in rendering either opinion testimony or 1006 testimony. This isn't just a matter of what the government calls categories. What this is is substantive testimony about the meaning and the conclusions behind the numbers. To say that an expenditure at Costco is for the benefit of a defendant is really making a qualitative judgment that they're misusing funds and that essentially they're stealing funds. Whether an opinion like that should be permitted at all is one question after the rigors of the Daubert examination and full and robust expert disclosure. But to do it under the guise of lay opinion testimony is a different matter entirely. There must have been some reason that the government wanted to avoid a Daubert hearing and the full trappings of expert witness testimony. The 2000 amendments to 701 make clear that you can't do this maneuver of dressing up expert testimony in lay clothing and then doing an end round around Daubert. I would just finish by saying that the prejudice, I think in a way, has sort of been demonstrated in our conversations here this morning. I would suggest that sort of hovering above all of us are these pie charts and these representations about 40% was spent on this and 20% was spent on this. It's what matters to people, whether they be judges, whether they be jurors. How was the money spent, and were they pocketing this much or were they pocketing that much, and what were they spending it on? That was really a fundamental question, and I wholeheartedly disagree with the government that there was not any evidence beyond this key government witness to try to sort out that question. You can take a smattering here about whether they went to this restaurant or a comment about whether they went to this strip club, but the heavy lifting, the overwhelming evidence, not in terms of guilt but in terms of how the government tried to prove their case, came from this one forensic accountant with unproven methodology and without compliance with the rules of evidence. So I think the harm is the charts and the numbers and the finances we've been talking about this very morning. So thank you very much. Thank you. The case is adjourned and will be submitted.
judges: Reinhardt, W. Fletcher, Owens